**NOT FOR PUBLICATION [18]**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

_____

)
H&R GRENVILLE FINE DINING, INC.,            )
d/b/a the Grenville Hotel and Restaurant;   )          Civil Action No: 3:10-cv-00325 (FLW)
HARRY TYPALDOS and                          )
RENEE TYPALDOS,                             )
                                            )
                    Plaintiffs,             )                    **OPINION**
v.                                          )
                                            )
BOROUGH OF BAY HEAD;                        )
JOHN BERKO; ARTHUR PETRACCO;                )
MARY GLASS; JOHN & JANE DOES,               )
A-Z, said names being fictitious and their  )
legal status to be determined, and XYZ      )
Entities (1-5) said names being fictitious   )
and their legal status to be determined.    )
                                            )
                    Defendants.             )
_____)

**WOLFSON, United States District Judge:**

Presently before the Court is a motion by Defendants the Borough of Bay Head ("the

Borough"), John Berko ("Berko"), and Mary Glass ("Glass") (collectively "Defendants") for

summary judgment.[1]  Defendants' motion arises out of a Complaint filed by Plaintiffs H&R

Grenville Dining, Inc., d/b/a the Grenville Hotel and Restaurant ("the Grenville"), Harry

Typaldos, and Renee Typaldos (collectively "Plaintiffs") alleging conspiracy under 42 U.S.C. §

1985(3) (Count One), violations of the Equal Protection Clause and of Procedural and/or

Substantive Due Process under the Fourteenth Amendment (Count Two), Retaliation under 42

_____

[1]On April 4, 2011, the parties stipulated to dismiss Defendant Arthur Petracco from this matter.

1

U.S.C. § 1983 (Count Three), and Inverse Condemnation (Count Four). Specifically, Plaintiffs

allege that Defendants engaged in conspiratorial, discriminatory, and retaliatory conduct in

relation to, inter alia, the attachment and renewal of a liquor license at the Grenville.  For the

reasons set forth below, Defendants' motion is granted in its entirety.


**I. FACTUAL BACKGROUND**

**A. The Parties**

The Grenville is a hotel and restaurant located at 345 Main Avenue, Bay Head, New

Jersey.  Compl. ¶ 6.  The Grenville has functioned as a hotel since the early 1900s and, since

1987, has operated as a hotel and restaurant.  Id. ¶¶ 15, 16. The Grenville is currently owned and

operated by Harry and Renee Typaldos ("the Typaldos"). Compl. ¶¶ 7-8.

 In or about 1987, the Borough rezoned the area in which the Grenville is located to be

entirely residential.  Id. ¶ 19.  Indeed, at this time, the Grenville is the only preexisting,

nonconforming structure and use in an area zoned exclusively residential.  Defendants' Statement

of Material Facts ("DSMF") ¶ 4; Plaintiffs' Responsive Statement of Facts ("PRSF") ¶ 4.

The Grenville also operates pursuant to a resolution adopted by the Borough's Planning

Board on June 18, 1997. Certification of Brian W. McAlindin ("McAlindin Cert."), Ex. 28.  In

relevant part, the resolution approved an application by the Grenville to permit outdoor dining

during limited hours.  See id. at p. 1, 7-8, 12.

Defendant, the Borough, is a municipal corporation in the State of New Jersey. Compl ¶

9. At all relevant times, Defendants Glass and Berko were, and remain, members of the

governing body of the Borough, the Borough Council ("Borough Council" or "Council"). Id. ¶¶

11-12. Glass also owns and operates a bed and breakfast located at 2 Twilight Road, Bay Head, New Jersey. Id. ¶ 12.

**B. Plaintiffs' Purchase of the Grenville and Transfer of the Liquor License**

On or about December 27, 2003, the Typaldos entered into an agreement to purchase the Grenville from Joseph Milza ("Milza"). DSMF ¶ 8. In addition to owning the Grenville, Milza owned the Renault Winery in Egg Harbor, New Jersey, and, as a result, he was permitted to sell Renault Winery products, in their original packages, to the Grenville's guests under a Class A Plenary Winery License ("the Winery License"). DSMF ¶ 10; PRSF ¶ 10.

Importantly, Plaintiffs' acquisition of the Grenville did not include the Winery License. Id. ¶ 11. Because the Winery License was non-transferable, the Typaldos sought to purchase a Class C Plenary Retail Consumption License that would permit the Grenville to serve all types of alcohol. Id. ¶ 12. In that regard, Plaintiffs learned of a Liquor License previously issued by the Borough and held by Wacky's Inc., t/a The Bluffs ("Wacky's"). DSMF ¶ 12.[2] On or about March 8, 2004, the Typaldos entered into an agreement to purchase the Liquor License from Wacky's, contingent upon obtaining the necessary approvals to transfer the Liquor License to Plaintiffs and to the Grenville's physical premises (known as a "person to-person and place-to-place transfer"). DSMF ¶ 13; PRSF ¶ 13.

Plaintiffs closed on the purchase of the Grenville on or about April 7, 2004. Thereafter, Plaintiffs filed a transfer application with the Borough to obtain possession of the Liquor License

---

[2]Wacky's License was an inactive "pocket" license with Wacky's as the named licensee and an activation deadline of June 30, 2006. DSMF ¶ 23; PRSF ¶ 23.

and to attach it to the Grenville's premises.  Id. ¶¶ 14-15.  Plaintiffs' transfer application was met with resistence by residents and neighbors who retained an attorney to challenge the transfer. DSMF ¶¶ 15, 16; PRSF ¶¶ 15,16.   In an August 5, 2004 memorandum, the objectors urged the Borough Council to deny the transfer of the Liquor License for a number of reasons including, in relevant part, that the "sale and consumption of alcoholic beverages at the Grenville would constitute the expansion of a pre-existing, nonconforming, commercial use in a residential zone which requires a use variance pursuant to N.J.S.A. 40:55D-70(d), which [the Grenville] has not even applied for." McAlindin Cert., Ex. 18, at 7.  Shortly thereafter, the Borough Council, denied the transfer of the Liquor License because of doubts about the legality of the place-to-place transfer.  DSMF ¶ 18; PRSF ¶ 18.

The Grenville appealed the Borough's denial of the transfer of the Liquor License to the State of New Jersey, Division of Alcoholic Beverage Control ("ABC").  Despite the Borough's denial, Plaintiffs waived the contingency provision and closed on the purchase of the Liquor License from Wacky's.  DSMF ¶ 19.  In addition, residents filed suit against the Grenville and Plaintiffs commenced a separate action pertaining to an easement held in common among Plaintiffs and several of the Grenville's neighbors. DSMF ¶¶ 19-21; PRSF ¶¶ 19-21.

In or around June 2006, Plaintiffs and the neighbors executed a voluntary global settlement agreement (the "Settlement Agreement" or "Agreement").  Id. ¶ 22.  As part of the Agreement, Plaintiffs agreed to limit the scope and use of the Liquor License to wine only and to abide by other restrictions on the Grenville's operations.  DSMF ¶ 24; PRSF ¶ 24.  Plaintiffs also agreed that the Borough retained the power to enforce the terms of the Settlement Agreement as well as the conditions imposed upon the transfer of the Liquor License.  DSMF ¶ 26; PRSF ¶ 26.

4

Plaintiffs further agreed that any citizen could report to the Borough any alleged violation of the terms of the Settlement Agreement, the conditions placed upon the Liquor License, or any other law, regulation or ordinance.  <u>Id</u>. ¶ 26; <u>Id</u>.¶ 26.  In exchange, the neighbors agreed not to oppose the Grenville's application to transfer the Liquor License.  DSMF ¶ 25; PRSF ¶ 25.   The effectiveness of the Settlement Agreement was contingent upon the Borough's approval of the transfer of the Liquor License, as limited by the Agreement. DSMF ¶ 24; PRSF ¶ 24.

Thereafter, Plaintiffs reapplied with the Borough to transfer and attach the Liquor License to the Grenville. DSMF ¶ 29; PRSF¶ 29.  On or about August 15, 2006, the Council adopted Resolution No. 2006-57, approving a person-to-person and place-to-place transfer of the Liquor License subject to "[a]l terms and conditions" of the Settlement Agreement.  DSMF¶ 29; McAlindin Cert., Ex. 31 – Schedule A, condition "q."   The Resolution prohibited the Grenville from engaging in the sale, service, and/or delivery of wine until it "received all necessary land use approvals from the [Borough] Planning Board."  McAlindin Cert., Ex. 31 – Schedule A, condition "p"; DSMF ¶ 31.  Thus, it is undisputed that Plaintiffs could not begin to sell wine under the Liquor License until the conditions imposed on the License were satisfied.  DSMF ¶ 31; PRSF ¶ 31.  Once the conditions of the Liquor License were satisfied, the Grenville would have a Liquor License issued by the Borough physically attached to its location.[3]

**C. The Grenville Begins Serving Wine without Consulting the Borough Planning Board**

---

[3]The Court notes that the Grenville had never had a license sited at its location becasue Milza's license was sited at the Renault Winery in Egg Harbor City, New Jersey.   DSMF ¶ 32; McAlindin Cert., Ex. 9.

Immediately following the Borough's adoption of Resolution No. 2006-57, the Grenville began to sell wine.  DSMF ¶ 35.   Sometime thereafter, Roger Mentz, a neighbor of the Grenville who was involved in the litigation that culminated in the Settlement Agreement, complained by letter or email to the Borough about the Grenville's failure to comply with condition "p" of the Settlement Agreement.  McAlindin Cert., Ex. 4 at 48:20-49:21, 140:21 – 141:1, 145:14 – 146:3. Thereafter, in December 2006, the Borough notified Plaintiffs of their failure to satisfy conditions "p" and "q" of the Settlement Agreement by failing to receive all necessary land use approvals from the Borough Planning Board – conditions that the Borough considered a prerequisite to Plaintiffs being able to utilize the Liquor License. DSMF ¶ 36.   These approvals related to the expansion / intensification of the Grenville's pre-existing, nonconforming use due to the Grenville's request for an expanded outdoor dining season and the attachment of the Liquor License to the property. DSMF ¶¶ 32-33; PRSF ¶¶ 32-33.[4]

Importantly, Plaintiffs do not appear to dispute that they did not receive the necessary land use approvals prior to serving wine at the Grenville; instead, Plaintiffs aver that based on a misunderstanding, they "were under the impression that selling wine was not geared toward a land use, but rather a time use issue since the Grenville had previously sold wine and champagne." PRSF ¶ 36.  In other words, despite the specific language of the Resolution, Plaintiffs thought that they did not need approval from the Planning Board because Milza had previously sold wine at the Grenvile.  Id.  Moreover, Plaintiffs did not secure the necessary land use approvals from the Borough's Planning Board until October 2007, more than a year after the

---

[4]Unlike Milza's license to sell wine at the Grenville which was granted by the state of New Jersey and which was limited to Renault Winery products, the Grenville's Liquor License permitted Plaintiffs to sell any kind of wine and was issued by the Borough. DSMF ¶ 33.

Borough adopted Resolution 2006-57 approving the transfer of the Liquor License subject ot the

Settlement Agreement.  DSMF ¶ 36; PRSF ¶36.


**D. Renewal of Liquor License for 2007-2008 Term**

In April 2007, the ABC sent the renewal application for the Grenville's Liquor License

for the 2007-2008 term to the Borough's Municipal Clerk, Patricia Applegate ("Applegate").

DSMF ¶ 37; PRSF ¶ 37.  The renewal application contained an ABC stamp stating that the ABC

considered the Liquor License an inactive "pocket" license; as a result, the application needed a

special ruling from the ABC pursuant to N.J.S.A. 33:1-12.39[5] before the Borough could act upon

the renewal.  Id.  At the time she received the application, Applegate believed that the

correspondence may have been incorrect, and that the Liquor License was active.  Id. ¶ 38; see

also McAlindin Cert., Ex. 5 at 36:15-19.  Applegate inquired about the matter with the ABC, but

the ABC advised her to process the application as marked. See id.; McAlindin Cert., Ex. 5 at

37:2-7; McAlindin Cert., Ex. 37 at 18:2-16.[6]

---

[5]Specifically, N.J.S.A. 33:1-12.39 provides, in relevant part, "[n]o Class C license . . .shall be
renewed if the same has not been actively used in connection with the operation of a licensed
premises within a period of two years prior to the commencement date of the license period for
which the renewal application is filed unless the director, for good cause and after a hearing,
authorizes a further application for one or more renewals within a stated period of years. . .."
N.J.S.A. 33:1-12.39.

[6] Plaintiffs assert that Applegate never contacted anyone from the ABC regarding the Liquor License,
and instead "merely processed the process as marked without verifying its accuracy." PRSF ¶ 39.
However, Plaintiffs have proffered nothing in support of this assertion, and, indeed, Applegate
testified that she "recall[ed] speaking to someone . . . at ABC[,] [a]nd I was told that if it's marked
as a 12.39, that's the way it has to be processed." See McAlindin Cert., Ex. 5 at 37:2-45.

7

Subsequently, on or about April 9, 2007, Applegate forwarded Plaintiffs the 2007-2008 renewal application, as well as instructions from the ABC regarding the renewal of retail licenses and compliance with N.J.S.A. 33:1-12.39.  DSMF ¶¶ 37, 39; McAlindin Cert., Ex. 36.   In a letter to Plaintiffs accompanying the renewal materials, Applegate explained that "[t]he Division of Alcoholic Beverage Control considers this license inactive and will require you to first obtain a 'Special Ruling' from the Director of the New Jersey Division of Alcoholic Beverage Control." McAlindin Cert, Ex. 36.  In addition, the instructions under N.J.S.A. 12.39 dictate that those who had been transferred a license within "the last year . . . must petition the [ABC] as outlined in this letter pursuant to N.J.S.A. 33:1-12.39 before your local governing body can renew the license for the 2007-2008 term."  McAlindin Cert, Ex. 36, "N.J.S.A. 33:1-12.39 Instructions."

On June 15, 2007, Plaintiffs submitted the renewal application to Applegate, who forwarded it to the ABC; however, at that time, Plaintiffs had neglected to petition the ABC for a special ruling as required by the ABC, nor did they seek to correct or clarify the status of the Liquor License with the ABC despite Applegate's April 2007 Letter.  DSMF ¶¶ 40-41; McAlindin Cert., Ex. 3, Deposition of Renee Typaldos ("R. Typaldos Dep.") at 210:17-24.

The Liquor License expired on June 30, 2007.  DSMF ¶ 42; PRSF ¶ 42.   At that time, the ABC had not issued a special ruling or otherwise notified the Borough about the Grenville's renewal application for the 2007-2008 term.  DSMF ¶ 43.   Once the Liquor License expired, the Grenville no longer had the ability to sell wine.  Id.

On July 3, 2007, the Borough sent a letter to the ABC outlining their objections to the renewal of the Grenville Liquor License.  DSMF ¶ 46; PRSF ¶ 46; McAlindin Cert., Ex. 45. Specifically, the Borough objected to the renewal for the following reasons: (1) the Grenville had

8

failed to fulfill conditions imposed on the license; (2) the Grenville had advertised the sale of liquor in violation of the license which provided for wine service only; and (3) the Borough had received citizen complaints concerning the unlawful service of wine at the Grenville.  McAlindin Cert., Ex. 45.  The Borough did not send a copy of the letter to Plaintiffs.  PRSF ¶ 46; McAlindin Cert., Ex. 37 at 35:14-36:8.

On or about July 20, 2007, the ABC advised the Borough that Plaintiffs should have notified the ABC that the Liquor License was active, i.e., that the Liquor License had become activated at the Grenville after the Borough approved the transfer of the license.  DSMF ¶ 47; PRSF ¶ 47.  On that same day, as a result of the letter from the ABC, the Borough informed Plaintiffs that the ABC had requested the Borough "to communicate with you concerning the status of the above liquor license. . . the [ABC] has indicated to the [Borough] that you should have notified them of the transfer of your license (pocket license) after you received municipal transfer approval last August, 2006."  McAlindin Cert., Ex. 46.  The Borough further advised Plaintiffs that they had

> not complied with the conditions in last years license which would allow you to commence the sale of wine. Also, pursuant to N.J.A.C. 13:2-2.10(b) if a municipality is unable to act on a license renewal application prior to June 30, 2007, the licensee may apply to the [ABC] for a *Special Ad Interim Permit* to operate its licensed business pending municipal action. If a License is not renewed prior to June 30, 2007 and an Ad Interim Permit has *not* been issued to the licensee, the licensee will be required to cease active operation of its business at midnight June 30, 2007.  For all the reasons stated above, you are not permitted to sell wine or any other alcoholic beverage.

> Id.(emphasis in original).

On July 25, 2007, the ABC responded to the Borough's July 3, 2007 letter, explaining in relevant part, that the 12.39 designation was a mistake. McAlindin Cert., Ex. 39. As a result, the ABC advised the Borough that it was "free to grant or deny renewal of the [] 2007-2008 license term and to impose such conditions that may be supported in the exercise of reasonable exercise of its discretion." Id. The letter further advised that "[b]y copy of this letter I am also advising the licensee of the status of this matter. Furthermore, until this license is renewed for the 2007-2008 term the licensee is not authorized to sell alcoholic beverages for consumption on the licensed premises." Id. (emphasis added).

On or about August 7, 2007, Plaintiffs completed an application for an Ad Interim Permit so that the Grenville could serve wine pending the Borough's renewal of the Liquor License for the 2007-2008 term. DSMF ¶ 52. The application contained a section for the Borough to complete. Id. At a regularly scheduled meeting of the Borough Council held on that same day, Applegate presented the Ad Interim Permit application to the Council for completion. DSMF ¶¶ 52-53. In the application, and by letter to the ABC, the Borough objected to the issuance of the Ad Interim Permit. Id. ¶ 54; McAlindin Cert., Exs. 49, 50. Specifically, in a letter to the ABC, the Borough objected to the issuance of the Ad Interim Permit because: (1) the Grenville had failed to fulfill conditions imposed on the Liquor License which "must be met prior to the service of wine"; (2) the Grenville had advertised the sale of and was selling alcoholic beverages other than wine in violation of the terms of the Liquor License; (3) the Borough had received citizen complaints regarding the Grenville's service of beverages other than wine; and (4) the Grenville continued to violate the terms of its Liquor License as well as state rules and regulations.

10

McAlindin Cert., Ex. 50.   Notwithstanding the objections by the Borough, on or about August 9,

2007, the ABC granted the Ad Interim Permit to Grenville. DSMF ¶ 54; PRSF ¶ 54.

Thereafter, on or about September 4, 2007, pursuant to Resolution No. 2007-51, the

Borough approved the Grenville's renewal application for the 2007-2008 term.  Id. ¶ 55;

McAlindin Cert., Ex. 51.  However, in addition to subjecting the license to the same initial

conditions imposed by the Settlement Agreement, the Borough also prohibited the Grenville

from engaging in wine service until the Planning Board rendered a decision on the Grenville's

land use application and the Borough reserved the right to file charges against the Grenville for

any alleged violations that had occurred since August 15, 2006.  DSMF ¶ 55; PRSF ¶ 55.

Further, the Resolution provided that if the Planning Board denied the Grenville's land use

application, the Grenville could only operate during the hours of operation as set forth in the

Planning Board's June 18, 1997 resolution.  McAlindin Cert., Ex. 52, Schedule A – condition

"u."

On or about October 17, 2007, Plaintiffs received the land use approvals from the

Borough's Planning Board. DSMF ¶ 56; PRSF ¶ 56; McAlindin Cert., Ex. 35.


**E. Renewal of Liquor License for 2008-2009 and 2009-2010 Term**s


In April 2008, Applegate forwarded to Plaintiffs the renewal application materials for the

2008-2009 term.  DSMF ¶ 59; PRSF ¶ 59.  In June 2008, Plaintiffs submitted an incomplete

application to the Borough.  Id. ¶ 60; Id.¶ 60.  Specifically, Plaintiffs failed to obtain a Tax

Clearance Certificate demonstrating that the Grenville had timely paid sales taxes to the State of

New Jersey, an item required before the Borough could act upon the renewal application. Id.; Id. As a result, the Grenville was required to obtain an Ad Interim Permit to continue wine service. Id.; Id. [7]

After the Grenville secured a Tax Clearance Certificate, the Borough approved the Grenville's renewal application for the 2008-2009 term on August 19, 2008. DSMF ¶ 70; PRSF ¶ 70. The Borough placed the same conditions on the Liquor License from the prior year, but also noted that the Grenville had received the land use approvals. DSMF ¶ 70; PRSF ¶ 70.

Similarly, for the 2009-2010 term, the Grenville could not timely secure a Tax Clearance Certificate to submit a complete renewal application for the Borough to act upon. DSMF ¶ 61; PRSF ¶ 61. At the June 15, 2009 meeting of the Borough Council, the Borough Council noted that its agenda did not include the Grenville's renewal application for the 2009-2010 term. DSMF ¶ 74; PRSF ¶ 74. The Council also noted that the Grenville's Liquor License would expire on June 30, 2009, and that this had the potential to create issues because the next Borough Council meeting was not scheduled until July 6, 2009. Id.; Id. As a result, the Borough Council sought a legal opinion regarding the Borough's options in the event the Liquor License expired and the Grenville continued to serve wine. DSMF ¶ 75; PRSF ¶ 75.

In response, the Borough attorney stated that it was permissible for the Borough to inform the ABC of the lapsed Liquor License before July 1, 2009, because it was not possible for a renewal to occur before the Liquor License expired. DSMF ¶ 76; McAlindin Cert., Ex. 74, Transcript of Meeting of Bay Head Council (June 15, 2009) ("June 15 Borough Meeting Tr.") at

---

[7] In order to apply for an Ad Interim Permit under these circumstances, the ABC required Plaintiffs to secure and hand deliver temporary Tax Clearance Certificates to the ABC with the Ad Interim applications. Def.'s Material Facts ¶ 61.

34:13-22.  The Borough attorney also advised the Borough Council that the Borough's police department could issue summonses to the Grenville if it operated without the Liquor License being renewed.  DSMF ¶ 77; McAlindin Cert., Ex. 74, June 15 Borough Meeting Tr. at 40:12-24.

On or about June 30, 2009, Plaintiffs requested an Ad Interim Permit because of their inability to timely secure a Tax Clearance Certificate for a completed renewal application for the 2009-2010 term.  DSMF ¶ 79; PRSF ¶ 79.  As in the past, the Ad Interim Permit required certain responses from the Borough before it could be forwarded to the ABC.  Applegate advised Plaintiffs that, consistent with past practice, the Ad Interim Permit application would have to be brought before the Council for completion at its next regularly scheduled meeting on July 6, 2009.  Id. ¶ 80.  Despite the Borough's failure to complete the Ad Interim Permit before their regularly scheduled meeting, the ABC issued the Grenville an Ad Interim Permit on July 1, 2009.  DSMF ¶ 81; PRSF ¶ 81.  Thereafter, on July 20, 2009, once the Grenville submitted the missing Tax Clearance Certificate, the Borough approved the Grenville's renewal application for the 2009-2010 term.  DSMF ¶ 82; PRSF ¶ 82.

**F.  Investigation of the Grenville for Liquor License Violations**

In or around June 2007, the Borough police department sought to determine whether Plaintiffs had violated the terms of the Settlement Agreement or the conditions of the Liquor License by serving alcohol other than wine or by unlawfully serving wine without obtaining the land use approvals.  DSMF ¶ 44; PRSF ¶ 44.  In that regard, on June 4, 2007, the Borough Chief of Police requested that an officer dine at the Grenville and report any liquor license violations.  Subsequently, on June 16, 2007, a Borough police officer dined at the Grenville and reported

13

being served wine.  McAlindin Cert., Ex. 41.  On July 30, 2007, again at the request of the Police

Chief, two Borough citizens visited the Grenville and also reported being served wine.

McAlindin Cert., Ex. 42.  The following weekend, on August 5, 2007, a police officer witnessed

an attendee of a wedding party at the Grenville consuming a bottle of beer on a public sidewalk

outside the Grenville, and further noted that beer was also being served inside the Grenville.

McAlindin Cert., Ex. 43.

Thereafter, on April 5, 2008, a resident complained to the Borough police department

about excessive noise emanating from the Grenville in violation of the Borough's noise

ordinance.  DSMF ¶ 57; PRSF ¶ 57.  The Borough police department responded to the complaint

at approximately 10:47 p.m.  Id.  According to Plaintiffs, "the officers allowed the engagement to

continue, albeit to the dissatisfaction of those attending the event, with instructions for the hired

musical entertainment to significantly reduce the volume." Compl. ¶¶ 57-58.

On or about May 20, 2008, the Borough served the Grenville with a notice of formal

charges for the service of alcohol without a valid Liquor License on July 30, 2007 and August 5,

2007.  DSMF ¶ 66; McAlindin Cert., Ex. 45, 67.  On July 29, 2008, the Borough Council held a

disciplinary hearing and found that the Grenville had committed the alleged violations for

incidents occurring on July 30, 2007 and August 5, 2007. DSMF ¶ 67.[8]  As a result, the Borough

imposed a 90-day suspension on the Grenville.  Id.  The Grenville appealed the suspension to the

ABC, who stayed the punishment.  Id. ¶ 68.  On or about September 16, 2008, a settlement was

---

[8]At the hearing, the Borough attorney noted that Councilwoman Glass recused herself in the
matter because her daughter was going to testify as a witness to one of the alleged incidents of
illegal wine sales. See McAlindin Cert., Ex. 37 at 10:14-19).

reached and the Grenville agreed to withdraw the appeals in exchange for a reduced suspension of 15 days, which it served during January and/or of February of 2009. DSMF ¶¶ 71-72.

## G. Water Issues

During the afternoon hours on July 4, 2008, residents of the Borough experienced a discolored water problem that required the water company to release water from hydrants onto Route 35, the main traffic artery in the Borough.  DSMF ¶ 63; PRSF ¶ 63. The Borough's water company attempted to solve the issue by flushing the system, but because the flushed water led to flooding and traffic problems on a peak holiday weekend, the Borough Police Department ordered the water company to cease repairs and return the next day. Id. ¶ 61; DSMF ¶ 63 Plaintiffs aver that they made several phone calls that day to the water company, as well as 911 and other enforcement agencies. PRSF ¶ 64.  Importantly, the water problem affected not just the Grenville, but many other residents and businesses in the Borough.  Id. ¶ 65; Id. ¶  65.  The water problem was fixed the following day. PRSF ¶ 64.

## II. PROCEDURAL HISTORY

On January 20, 2011, Plaintiffs filed the instant Complaint alleging conspiracy under 42 U.S.C. § 1985(3) (Count I), violations of the Equal Protection Clause and of Procedural / Substantive Due Process under the U.S. Constitution's Fourteenth Amendment pursuant to 42 U.S.C. § 1983 (Count II), Retaliation under 42 U.S.C. § 1983 (Count III), and Inverse Condemnation (Count IV).  Plaintiffs aver that since the Borough Council approved the transfer of the Liquor License on or about August 15, 2006, "Defendants have unlawfully continued to

conspire to deprive the Grenville of its lawful property rights, in various and diverse manners."
Compl. at ¶ 31.  Plaintiffs seek preliminary and permanent injunctive relief prohibiting
Defendants "from taking any further unlawful actions against the Plaintiffs," as well as
compensatory and punitive damages. Compl. at 14.

On June 20, 2011, Defendants filed a motion for summary judgment.  On September 19,
2011, Plaintiffs filed a brief in opposition to Defendants' motion. On September 26, 2011,
Defendants filed a reply brief in support of their motion for summary judgment.

## III. STANDARD OF REVIEW

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing
the facts in the light most favorable to the non-moving party, the moving party is entitled to
judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n. 1 (3d
Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed.R.Civ.P.
56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a
reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d
418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In
determining whether a genuine issue of material fact exists, the court must view the facts and all
reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem,
298 F.3d 271, 276–77 (3d Cir. 2002). For a fact to be material, it must have the ability to "affect
the outcome of the suit under governing law." Kaucher, 455 F.3d at 423. Disputes over irrelevant
or unnecessary facts will not preclude a grant of summary judgment.

16

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Monroe v. Beard, 536 F.3d 198, 206–07 (3d Cir. 2008). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256–57. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." Id. at 206 (quoting Matsushita, 475 U.S. at 586). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. S.E.C. v. Antar, 44 F. App'x. 548, 554 (3d Cir. 2002).

**IV. Discussion[9]**

---

[9]The Court notes that in addition to their substantive arguments regarding each of Plaintiffs' causes of action, Defendants also contend that: (1) Plaintiffs' claims against Berko and Glass must be dismissed as a matter of law based on qualified immunity; and (2) Plaintiffs H. Typaldos and R. Typaldos lack individual standing to pursue this action. See Def.'s Br. at p. 58-62.  Because the Court grants Defendants' motion for summary judgment on the merits as a matter of law, the Court need not reach these additional issues.

### A. Conspiracy under 42 U.S.C. § 1985(3) (Count One)

In this motion, Defendants contend that they are entitled to summary judgment on Count I because Plaintiffs have wholly failed to make out a claim for conspiracy under 42 U.S.C. § 1985(3).  For the reasons set forth below, the Court agrees.

Section 1985(3) permits a party to bring an action to recover for injuries incurred by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."  42 U.S.C. § 1985(3).  To establish a claim for civil conspiracy under 42 U.S.C. § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States. Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997).

Importantly, however, the Supreme Court has limited the reach of claims under section 1985(3).  Indeed, "although section 1985(3) applies to private conspiracies, the statute was not intended to provide a federal remedy for 'all tortious, conspiratorial interferences with the rights of others,' or to be a 'general federal tort law.'" Farber, 440 F.3d at 135 (quoting Griffin, 403 U.S. at 101-102).  Thus, the Supreme Court noted that to assert a 1985(3) claim, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).  Moreover, the Supreme Court has expressly held that commercial or economic animus cannot form the basis for a cognizable § 1985(3) claim. United Brotherhood of Carpenters & Joiners of America v. Scott,

18

463 U.S. 825, 828-829 (1983); see also Farber, 440 F.3d at 138 (holding that discrimination on the basis of political beliefs is "not so 'invidious' as to qualify for § 1985(3) protection."). Thus, 'class' for the purposes of section 1985(3)

> unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with.

Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268 (1993).

Further, while "there are no precise parameters defining the boundaries of 'class' within the meaning of section 1985(3)," Lake, 112 F.3d at 685, the Third Circuit has held that "a reasonable person must be able to 'readily determine by means of an objective criterion or set of criteria who is a member of the group and who is not." Farber, 440 F.3d at 136 (quoting Aulson v. Blanchard, 83 F.3d 1, 5-6 (1st Cir. 1996)). The requirement that group membership be capable of ready determination reflects the Third Circuit's long-held determination that "[s]uch animus against a class must be based on: (1) immutable characteristics for which the members of the class have no responsibility; and (2) historically pervasive discrimination." Russo, 403 F. Supp. 2d at 359-60 (citations omitted); see, e.g., Lake, 112 F.3d at 687 (finding that "mentally retarded" persons are a 'class' entitled to protection under § 1985(3)); Novotny v. Great Am. Fed. Sav. & Loan Ass'n, 584 F.2d 1235 (3d Cir. 1978), rev'd on other grounds, 442 U.S. 366 (1979) (relying on the "immutable nature of gender" to hold that women are a protected class under § 1985(3)).

Applied here, the Court finds that Plaintiffs have entirely failed to establish any of the elements of a conspiracy under 1985(3).   Initially, the Court notes that Plaintiffs have not

19

alleged, let alone established, a conspiracy, an act in furtherance of the conspiracy or a harm suffered as a result of the alleged conspiracy.  42 U.S.C. § 1985 (3)(stating, in relevant part, "If two or more persons ... conspire ... for the purpose of depriving. either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.").   Moreover, even if Plaintiffs could establish the conspiracy and injury elements of a section 1985(3) claim, Plaintiffs have entirely failed to identify any group or class to which they belong, let alone identify any racial or otherwise class-based discriminatory animus as required by the statute.  Indeed, the Court notes that in response to Defendants' argument that Plaintiffs  "do not allege membership in any protected class based on race or some other suspect quality," Defs' Br. at 16, Plaintiffs do not suggest that they belong to a group or class as required by the statute; instead, Plaintiffs  argue, in reliance on Lake,  that "the term 'class' is somewhat amorphous and lacks clearly defined contours."  Pls' Opp. at 9.  Plaintiffs' reliance on Lake is misplaced.  In Lake, the court found that the mentally challenged comprise a protected class because they bear no responsibility for their characteristics and have been pervasively discriminated against.  Unlike Lake, Plaintiffs here identify no class to which they belong, let alone attempt to convince the Court to expand the definition of class to include them.

Further, to the extent that Plaintiffs rely on Lake to suggest that the term "class" has no meaning whatsoever, Plaintiffs are wrong.  The term "class" is not devoid of meaning.  Indeed, as the Third Circuit expressly recognized in Lake, although what constitutes a "class" may shift over time, no court has construed the term "class" to be toothless or meaningless.  Lake, 112 F.3d at 688 (recognizing that the term "class" comprises an "immutable characteristic" such as race, gender or mental handicap).  For these reasons, the Court finds that, as a matter of law, Plaintiffs

have failed, <u>inter alia</u>, to identify any class to which they belong and thus, fail to state a claim under section 1985(3); summary judgment for Defendants on Count One is warranted.

B. **Equal Protection and/or Due Process Violations under 42 U.S.C. § 1983 (Count Three)**[10]

Next, Defendants argue that summary judgment is warranted on Plaintiffs' claims under 42 U.S.C. § 1983. Section 1983 provides remedies for deprivations of rights established in the Constitution or federal laws. The statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress.

42 U.S.C. § 1983.

The statute does not, however, create substantive rights. <u>Baker v. McCollan</u>, 443 U.S. 137, 145 n. 3(1979). To state a § 1983 claim, a plaintiff must demonstrate that the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States. <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49-50 (1999); <u>Mark</u>

---

[10]The Court is compelled to note the inadequate nature of Plaintiffs' pleading; indeed, rather than set forth three separate counts for the two alleged due process violations and the equal protection violation, Plaintiffs lumped these divergent causes of action into a single Count in the Complaint. Compl. ¶ 108(" The aforesaid actions of the Defendants deprived Plaintiffs of their substantive and/or procedural Due Process protections and or the Equal Protection of the Federal, State and Local Laws. . ."). Moreover, not only have Plaintiffs pled these causes of action in the alternative, but the entirety of Count Two is four sentences. Despite the inadequacy of this pleading, the Court will attempt to separately construe each of the causes of action for the purposes of resolving this summary judgment motion.

v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir.1995).  Accordingly, "[t]he first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.' " Nicini, 212 F.3d at 806 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5(1998)).

In the instant matter, Plaintiffs allege causes of action under section 1983 based on a violation of Equal Protection and/or due process of law.  Compl. Count Two.  In this motion, Defendants argue that Plaintiffs' Equal Protection claims must be dismissed as a matter of law because Plaintiffs have not established protected class status sufficient to set forth a violation of the Equal Protection clause.  In addition, Defendants argue that there was a rational basis for Defendants' conduct.  Moreover, in response to Plaintiffs' claims for violation of due process, Defendants argue that there were no Substantive or Procedural Due Process violations.

1.    Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)(internal quotations and citations omitted).  Thus, "[t]he Supreme Court has held that the Equal Protection Clause is 'essentially a direction that all persons similarly situated should be

treated alike.'"  Buell v. Hughes, 596 F.Supp. 2d 380, 386 (D.Conn. 2009)(quoting City of

Cleburne, Tex., v. Cleburne Living Ctr. Inc., 473 U.S. 432, 439 (1985)).

 In that regard, the Court notes that to the extent that Plaintiffs argue that Defendants

violated their right to equal protection by failing "to treat the Ad Interim Permit application in the

same manner as a renewal," Pl's Reply Br. at 12, such a claim does not implicate the equal

protection clause.  Indeed, it is axiomatic that the Equal Protection clause protects people and not

processes.  Thus, the Court finds that, as a matter of law, Plaintiffs have not established a claim

to Equal Protection regarding the Borough's permitting process.

 Moreover, to the extent that Plaintiffs assert an Equal Protection claim by virtue of being a

part of a protected class, the Court finds that Plaintiffs have failed to allege or establish an Equal

Protection claim on that basis.[11]  It is well-established that plaintiffs may successfully assert an

equal protection claim, arguing that they have been treated differently from others, under a

number of different classifications:

> The courts apply different levels of scrutiny to [these] different types of
> classifications. At a minimum, a statutory classification must be rationally related
> to legitimate government purpose .... Classifications based on race or national
> origin ... and classifications affecting fundamental rights ... are given the most
> exacting scrutiny. Between these extremes of rational basis review and strict
> scrutiny lies a level of intermediate scrutiny, which generally has been applied to
> discriminatory classifications based on sex or illegitimacy.

Buell, 596 F. Supp.2d at 386 (quotations omitted).

 Although analysis under the Equal Protection Clause typically focuses on government

---

[11]Indeed, the Court is compelled to note that Plaintiffs' Opposition does not make this argument
in support of its equal protection claim; instead, inexplicably, Plaintiffs raise this argument in
support of their conspiracy claim.  Pls' Opp. Br. at 8.

classifications of groups that are treated differently than others, even an individual may merit such protection if he or she is being signaled out unreasonably.  See, e.g., Engquist v. Oregon Dept. of Agriculture, 553 U.S. 591, 601-02 (2008).  Thus courts created the so called "class of one":

> When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to assure that all persons subject to legislation or regulation are indeed being "treated alike, under like circumstances or conditions."  Thus when it appears that an individual is being singled out by the government, the specter of arbitrary classifications is fairly raised, and the Equal Protection Clause requires a "rational basis for the difference in treatment.

Id. at 602 (quoting Olech, 528 U.S. at 564).

In the instant matter, Plaintiffs do not allege that they are members of a suspect class.[12] Moreover, Plaintiffs have not identified a fundamental right that would require this Court to perform a strict scrutiny analysis.  Accordingly, Plaintiffs' Equal Protection claim appears to be that Plaintiffs are essentially a "class of one."

To succeed on an Equal Protection claim under a "class of one" theory, "a plaintiff must establish that: (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir.2006) (finding that the claim failed because there was no allegation of similarly situated individuals) (citing Olech, supra, 528 U.S.

---

[12]Indeed, the Court notes that other than the unsupported claim in their Opposition Brief that "The Grenville is part of a protected class," Pls. Opp. Br. at 12, Plaintiffs nowhere identify the class to which they allegedly belong, nor do they offer anything in support of this statement.

at 564); Mosca v. Cole, 217 Fed. Appx. 158, 164, No. 05-4350, 2007 WL 470505 at *5 (3d Cir.

Feb.14, 2007); Mayer v. Gottheiner, 382 F. Supp.2d 635, 650-51, 655 (D.N.J.2005).  In other

words, to succeed on a "class of one" theory, Plaintiffs must prove that they "ha[ve] been

intentionally treated differently from others similarly situated and that there is no rational basis

for the difference in treatment.'" Olech, 528 U.S. at 564.  One way for Plaintiffs to meet this

standard is to demonstrate that the alleged conduct was "irrational and wholly arbitrary."  Id. at

565; see also Engquist v. Oregon Dept. of Agr., 553 at 601.

    For example, in Olech, plaintiff asked the village to connect his property to the municipal

water supply.  Id. at 563.  The village conditioned the water connection on the Olechs granting

the village a 33-foot easement.  Id.  The Olechs objected, claiming that other property owners

seeking access to the water supply  were only required to provide 15-foot easements.  Id.  There,

the Supreme Court held that plaintiffs stated an Equal Protection claim by alleging that they were

treated differently from other land owners from whom the village took only a 15 foot easement in

exchange for water connectivity.  Id. at 565.  Thus, to obtain relief under Olech, a plaintiff must

first show that he has been treated differently from others similarly situated and, second, show

that the differential treatment was irrational and arbitrary.

    Applied here, the Court finds that Plaintiffs have failed to establish an Olech Equal Protection

claim.  Initially, the Court notes that Plaintiffs have not demonstrated that they have been treated

differently from others similarly situated.  Persons are similarly situated under the Equal

Protection Clause when they are alike "in all relevant aspects."  Nordlinger v. Hahn, 505 U.S. 1,

10 (1992).  Based on the record before me, it is undisputed that the Grenville is the only

nonconforming hotel and restaurant business within an exclusively residential zone with a license

to sell alcohol.  DSMF ¶ 7; PRSF ¶ 7; Def.'s Br. at p. 16-17, 28.[13]  Moreover, it is undisputed that the Grenville is the only business in the Borough that has ever needed to apply for an Ad Interim Permit.  DSMF ¶ 62; PRSF ¶ 62.  Thus, because Plaintiffs cannot demonstrate the existence of a similarly situated business in the Borough, Plaintiffs cannot satisfy the first factor of an Olech Equal Protection claim.

However, even assuming that Plaintiffs could establish that they were treated differently from others similarly situated, Plaintiffs have not demonstrated that any alleged differential treatment was irrational and arbitrary.  Indeed, the Court finds that the record demonstrates a rational basis for each of Defendants' actions.

For example, to the extent that Plaintiffs argue that the 2007 police investigations were "unwarranted," Pls' Opp. Br. at 14, Plaintiffs have proffered nothing in support of this claim. Instead, the record before me demonstrates that the 2007-2008 police investigations arose in response to residents' complaints regarding the Grenville's unlawful alcohol service as well as the Grenville's own advertisements offering alcohol other than wine in violation of its Liquor License.  McAlindin Cert., Ex. 45.  Moreover, the record demonstrates that the Borough police conducted their investigations independently and without any direction from the individual Defendants, and Plaintiffs have proffered nothing to suggest otherwise.  McAlindin Cert., Ex. 41-43.  Further, the record is clear that the police investigations demonstrated violations of both the Settlement Agreement as well as the conditions of the Liquor License.  Id.  Specifically, and in

---

[13]Indeed, to the extent that Plaintiffs attempt to characterize Glass's bed and breakfast as similarly situated, the Court finds that it is undisputed that Glass's establishment has a different capacity, different dining services and no liquor license.  Thus, the Court finds that the two establishments are not comparable for purposes of this dispute which revolves, almost entirely, around Plaintiffs' Liquor License.   DSMF ¶ 7; PRSF ¶ 7.

relevant part, the police investigations revealed that the Grenville had begun to serve wine without initially receiving the requisite land use approvals and that the Grenville was serving beer in violation of the conditions of the Liquor License.  Id.

Next, to the extent that Plaintiffs take issue with respect to the ABC's improper classification of the 2007-2008 liquor license as "inactive," the record is clear that the inactive status resulted from a mistake by the ABC, and not Defendants.  DSMF ¶¶ 37, 38; PRSF ¶¶ 37, 38.  Moreover, it is undisputed that Applegate notified Plaintiffs that the ABC considered the Liquor License an inactive "pocket" license that required a special ruling before the Borough could act on the renewal.  McAlindin Cert., Ex. 36.  Thus, any harm that Plaintiffs suffered as a result of the wrongful designation of the 2007-08 Liquor License was a result of the ABC's actions, not Defendants, and Plaintiffs' own failure to rectify the ABC's mistake concerning their Liquor License.

Moreover, to the extent that Plaintiffs take issue with Defendants' objections to the ABC concerning the renewal of their Liquor License or their applications for Ad Interim Permits, the record similarly demonstrates that Defendants had a rational basis for their actions.  For example, the Borough's July 3, 2007 letter to the ABC centered on the Grenville's  ongoing sales of alcohol despite its failure to meet the conditions imposed on the Liquor License.   McAlindin Cert., Ex. 45.  Moreover, despite Plaintiffs' contention that Defendants submitted such an objection without any proof of illegal wine service, the Court notes that the Borough's July 3, 2007 letter included, as an attachment, the Grenville's own advertisement which promoted the sale of wine and alcoholic beverages in violation of the Liquor License.  McAlindin Cert., Ex. 45.  Further, the Borough's July 3, 2007 letter cites various citizens complaints regarding the

27

Grenville's serving and selling of alcoholic beverages as well as a report by a local police officer who was sold wine at the Grenville notwithstanding the Grenville's failure to fulfill the conditions of its liquor license.  Id.

Finally, to the extent that Plaintiffs take issue with the Borough's treatment of the Grenville's 2009 Ad Interim Permit, the Court finds that the Borough's actions were not irrational or arbitrary.  Indeed, the record before me demonstrates that the Borough Council noticed that its June 15, 2009 agenda did not include the Grenville's renewal application for the 2009-2010 term despite the fact that this was the last regularly scheduled meeting of the Council that would occur prior to the expiration of the Grenville's Liquor License.  Thus, in light of the Grenville's ongoing failure to timely apply for renewal of its Liquor License, the Borough sought the advice of its attorney to decide how to proceed.  The Court finds that the Council's decision to seek the opinion of the Borough attorney in these circumstances was not arbitrary or irrational and Plaintiffs have proffered nothing to suggest that it was.  Moreover, it is clear from the record that Plaintiffs suffered no harm as a result of the Borough's decision to seek advice from the Borough attorney because the ABC issued Plaintiffs an Ad Interim Permit on July 1, 2009, the day after the Liquor License expired.  Thus, there appears to have been no gap in the Grenville's ability to serve wine during 2009-2010.  For these reasons, the Court will grant summary judgment to Defendant on Plaintiffs' equal protection claim.

**2. Due Process Violations**

Next, Plaintiffs appear to allege both substantive and procedural due process violations. In this

motion, Defendants contend that summary judgment is warranted on both the substantive and procedural due process violations because: (1) no substantive due process violation occurred since the claims do not involve a fundamental right; and (2) there was no deprivation of procedural due process.  For the reasons set forth below, the Court agrees.

a. <u>Substantive Due Process</u>

   The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."   While on its face this clause speaks to the adequacy of state procedures, the Supreme Court has held that the due process clause also has a substantive component.  <u>See, e.g.</u>, <u>Planned Parenthood of S.E. Pennsylvania v. Casey</u>, 505 U.S. 833, 846–47 (1992) ("it is settled that the due process clause of the Fourteenth Amendment applies to matters of substantive law as well as to matters of procedure") (quotations omitted)).  The Third Circuit has explained that substantive due process "is an area of law 'famous for controversy, and not known for its simplicity.' " <u>Nicholas v. Pennsylvania State Univ.</u>, 227 F.3d 133, 140 (3d Cir.2000) (citations omitted).  In that connection, the Third Circuit clarified that substantive due process encompasses at least two very different components. <u>Id.</u>

   The first component of Substantive Due Process is implicated when a plaintiff challenges the validity of a legislative act.  <u>Id.</u> Typically, "a legislative act will withstand substantive due process challenge if the government 'identifies a legitimate state interest that the legislature could rationally conclude was served by the statute,' although legislative acts that burden certain 'fundamental' rights may be subject to stricter scrutiny."  <u>Id.</u> (quotations and citations omitted);

see Alexander v. Whitman, 114 F.3d 1392, 1403 (3d Cir.1997).  The second component protects

against certain types of non-legislative state action.  To prevail on this claim, a plaintiff must first

establish as a "threshold matter that [it] has a protected property interest to which Fourteenth

Amendment's due process protection applies."  Woodwind Estates, Ltd. v. Gretkowski, 205 F.3d

118, 123 (3d Cir.2000).

     In the instant matter, Plaintiffs have entirely failed to allege a legislative act on the part of

Defendants that would subject them to a Substantive Due Process challenge.  In fact, in their

opposition brief, Plaintiffs appear to concede that they are challenging an executive action.  Pl's

Opp. Br. at 17 ("[E]xecutive actions typically involve employment decisions which apply to a

limited number of people, while legislative acts are more broadly construed.  A non-legislative

deprivation can still 'give rise to substantive due process claim [when there are ] allegations that

the government deliberately and arbitrarily abused its power.'")(quotations omitted)).  Thus, the

Court assumes that Plaintiffs are mounting a Substantive Due Process challenge to alleged

executive acts on the part of Defendants.

     The threshold inquiry in a non-legislative Substantive Due Process claim is whether a plaintiff

has a protected property interest to which the Fourteenth Amendment's due process protection

applies.  Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 140 (3d Cir.2000) (quoting

Woodwind Estates, Ltd. v. Gretkowski, 205 F.3d 118, 123 (3d Cir.2000), overruled on other

grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392 (3d

Cir.2003), cert. denied, 516 U.S. 93)).  Although it is well-settled that state-created property

interests are entitled to protection under the procedural component of the Due Process Clause,

"not all property interests worthy of procedural due process protection are protected by the

concept of substantive due process." Id. (citing Reich v. Beharry, 883 F.2d 239, 243 (3d Cir.1989)). "Rather, to state a substantive due process claim, "a plaintiff must have been deprived of a particular quality of property interest." Id. (quoting DeBlasio v. Zoning Bd. of Adjustment, 53 F.3d 592, 598 (3d Cir.1995)). "[W]hether a certain property interest embodies this 'particular quality' is not determined by reference to state law, but rather depends on whether that interest is 'fundamental' under the United States Constitution." Id. (citing Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 229 (1985)).

Once a plaintiff has identified a "fundamental" right, a plaintiff must allege a deprivation of a protected property interest by government conduct that "shocks the conscience." Chainey v. Street, 523 F.3d 200, 219 (3d Cir.2008); United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 399 (3d Cir.2003). "Whether an incident 'shocks the conscience' is a matter of law for the courts to decide." Benn v. Universal Health Sys., 371 F.3d 165, 174 (3d Cir.2004). "While there is no calibrated yard stick to determine whether challenged actions shock the conscience, the standard encompasses only the most egregious official conduct." Cherry Hill Towers, L.L.C. v. Township of Cherry Hill, 407 F. Supp.2d 648, 655 (D.N.J.2006) (internal citations omitted).

In that regard, the Court notes that in the Third Circuit it is well-established that, "[l]and-use decisions are matters of local concern and such disputes should not be transformed into Substantive Due Process claims based only on allegations that government officials acted with 'improper' motives." United Artists, 316 F.3d at 402. In the land-use context, limiting substantive due process claims to only the most egregious behavior prevents federal courts from "being cast in the role of a zoning board of appeals." Chainey, 523 F.3d at 219–20 (3d Cir.2008)

(quoting United Artists, 316 F.3d at 402).  Because "every appeal by a disappointed developer from an adverse ruling of the local planning board involves some claim of abuse of legal authority, ... it is not enough simply to give these state law claims constitutional labels ... in order to raise a substantial federal question under section 1983." United Artists, 316 F.3d at 402. Indeed, the Third Circuit has held that inconsistent application of zoning requirements, delaying permits and approvals, improperly increasing tax assessments, and maligning and muzzling a property owner, without more, is not the type of behavior that shocks the conscience. Id.

In the instant matter, to the extent that the Court can construe a Substantive Due Process challenge from Plaintiffs' Complaint, it appears that such a challenge arises out of Defendants' actions regarding the Grenville's Liquor License and applications for Ad Interim Permits.  Pls' Opp. Br. at 18.   Specifically, Plaintiffs contend, "[c]learly, the Borough had an improper motive when it made decisions outside the presence of the Plaintiffs regarding the renewal of the Grenville's liquor license, as well as, the applications for Ad Interim Permits, and thus substantial due process was violated."  In response, Defendants argue that: (1) substantive due process protection does not apply to the Liquor License; and (2) even if it did, the Borough's actions related to the Liquor License or the Ad Interim Permits do not shock the conscience. Defs' Br. at 36 -41.  The Court agrees.

Initially, the Court notes that Plaintiffs have offered nothing to support the assertion that their interest in the Liquor License or the Ad Interim Permit process constitutes a fundamental property interest sufficient to implicate a substantive due process claim.  Indeed, while at least one court in this District has held that a Liquor License may constitute a property interest for purposes of a procedural due process inquiry, Plaintiffs have cited no law, and the Court has

found nothing, to support the idea that a Liquor License constitutes a fundamental property interest for purposes of a substantive due process analysis. See Sea Girt Restaurant & Tavern Owners Assoc., v. Borough of Sea Girt, New Jersey, 625 F. Supp. 1482, 1488 (D.N.J. 1986).

Moreover, even assuming Plaintiffs could establish that they had a fundamental property interest in their Liquor License which was interfered with by Defendants, Defendants' alleged conduct does not rise to the level required to establish a violation of a substantive due process right.   Indeed, once a plaintiff satisfies the property interest element, the consideration of a substantive due process claim then turns on whether a plaintiff was denied this interest by arbitrary and capricious government action.   Whether an official's actions or inactions are deemed arbitrary has been assessed by the Third Circuit using a "shocks the conscience" test. Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 285 (3d Cir.2004).   Although the "shocks the conscience" test is not precise and depends largely on factual context, "[w]hat is clear is that this test is designed to avoid converting federal courts into super zoning tribunals."   Id.   Instead, the Circuit has found conscience-shocking behavior where the misconduct involves "corruption, self-dealing, or a concomitant infringement on other fundamental individual liberties."   Maple Prop., Inc. v. Twp. of Upper Providence, 151 F. App'x 174, 179 (3d Cir.2005).   Importantly, in that regard, the Third Circuit has explained that "the politics and animosities that often animate local decision-making are not matters of constitutional concern."   Maple Prop., 151 F. A'ppx at 180.

In the instant matter, Plaintiffs appear to suggest that various actions on the part of Defendants including "order[ing] unwarranted investigations by the police" and "self-dealing . . .by Defendant Glass" rise to the level of shocking the conscience.   The Court does not agree.   As

33

discussed above, based on the record before me, to the extent that the police investigated the

Grenville's alcohol service, such investigations were prompted by local complaints and not by

any actions of the Borough or Defendants.  Moreover, other than the unsupported statements that

Defendant Glass engaged in self-dealing or that her business benefitted as a result of alleged

misconduct, Pls' Opp. Br. at 19,  Plaintiffs have provided nothing to support these allegations.

As a result, the Court finds that summary judgment is warranted on Plaintiffs' claims for

violations of substantive due process.


b. Procedural Due Process

   The procedural component of the Due Process Clause of the Fourteenth Amendment provides

that a state shall not "deprive any person of life, liberty, or property, without due process of law."

U.S. Const. Amend XIV.  The Supreme Court has stated "[t]he requirements of procedural due

process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's

protection of liberty and property," Board of Regents v. Roth, 408 U.S. 564, 569 (1972), and that

"only a limited range of interests fall within this provision."  Hewitt v. Helms, 459 U.S. 460, 466

(1983).  Moreover, in a Procedural Due Process claim, "the deprivation by state action of a

constitutionally protected interest in 'life, liberty, or property,' is not itself unconstitutional; what

is unconstitutional is the deprivation of such an interest without due process of the law."

Zinermon v. Burch, 494 U.S. 113, 125 (1990).

   The Third Circuit has further explained that to "establish a cause of action for a violation of

Procedural Due Process, a plaintiff [must prove] that a person acting under color of state law

deprived [him] of a protected interest [and] that the state procedure for challenging the

deprivation does not satisfy the requirements of procedural due process." Midnight Sessions, Ltd., v. City of Philadelphia, 945 F.2d 667, 680 (3d Cir. 1991). Thus, in the present context, the Court must determine: (1) whether there is a liberty or property interest that has been interfered with by Defendants, and, if so: (2) whether or not the "procedures attendant upon that deprivation were constitutionally sufficient." Kentucky Dep't of Corrections v. Thompson, 490 I.S. 454, 460 (1989).

Here, Plaintiffs appear to contend that on two occasions, Defendants deprived them of their right to procedural due process. First, Plaintiffs contend that the July 3, 2007 letter that Defendants sent to the ABC deprived "them of the opportunity to respond to the objections stated." In addition, Plaintiffs argue that "Defendants prepared an objection letter that same year to an Ad Interim Permit before The Grenville had even submitted an application." Further, Plaintiffs appear to contend that Defendants' "consideration in 2009 of anticipatory punishments was clearly egregious." Pls' Br. at 21. As a result, Plaintiffs argue that they "have a viable claim for violations of. . . procedural due process and the Defendants have not persuasively established the lack thereof to warrant a grant of Summary Judgment." Id.[14]

---

[14]The Court is compelled to note that, once again, Plaintiffs appear to misunderstand the summary judgment standard. Unlike a motion to dismiss which requires the Court to determine whether a Complaint states a viable claim to relief, see Ashcroft v. Iqbal, --- U.S. ----, ----, 129 S.Ct. 1937, 1949, a summary judgment motion requires the Court to determine whether, as a matter of law, there is a genuine issue of fact for trial. Specifically, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). This, Plaintiffs have failed to do.

Specifically, with regards to the alleged Procedural Due Process violation arising from Defendants' 2007 objection letter to the ABC, to the extent that this claim relates to the renewal of Plaintiffs' liquor license, the Court notes that "a New Jersey liquor license is an interest in property for purposes of federal due process analysis." Sea Girt Restaurant, 625 F. Supp. at 1488.  Thus, Plaintiffs have satisfied the first prong of the procedural due process analysis.

 However, Plaintiffs have not demonstrated that they were entitled to any process with regards to the Borough's July 3, 2007 letter nor have they demonstrated that the procedures attendant to that deprivation were constitutionally significant.  Indeed,  as discussed above, although it is undisputed that Defendants wrote to the ABC in July 2007 to object to the renewal of the Liquor License, Plaintiffs have not established that any of the Defendants had control over the ABC's decision to renew the Liquor License for the 2007-2008 term or, for that matter, over the issuance of the Ad Interim Permits.  In fact, the record demonstrates that despite the Borough's objection, Plaintiffs received an Ad Interim Permit from the ABC in 2007, and, moreover, that on September 4, 2007, the Borough itself renewed Plaintiffs' Liquor License for the 2007-2008 term.  Thus, the Court is at a loss to understand the process of which Plaintiffs alleged they were deprived or the harm that Plaintiffs allege resulted.

 Next, to the extent that Plaintiffs contend that Defendants "considere[ed]. . .anticipatory punishments," in 2009 regarding the expiration of Plaintiffs' liquor license,  Plaintiffs have not alleged, let alone established, a property interest relating to this consideration sufficient to satisfy the first prong of the test for procedural due process.  Moreover, Plaintiffs have not established their right to any process related to the Borough's discussion of Plaintiff's soon-to-be-expired Liquor License.  Indeed, as discussed above, the record demonstrates that the Borough Council

noticed that its June 15, 2009 agenda did not include the Grenville's renewal application for the 2009-2010 term despite the fact that this was the Council's last regularly scheduled meeting prior to the expiration of the Grenville's Liquor License.  Thus, in light of the Grenville's ongoing failure to timely apply for renewal of its Liquor License, the Borough sought the advice of its attorney to decide how to proceed.  The Court does not understand how the Borough's consultation with the Borough attorney regarding the Grenville's soon-to-be-expired License implicates the due process clause.   Moreover, it is clear from the record that Plaintiffs suffered no harm as a result of the Borough's decision to seek advice from the Borough attorney because the ABC issued Plaintiffs an Ad Interim Permit on July 1, 2009, the day after the Liquor License expired.  Thus, the Court finds that Plaintiffs cannot withstand Defendants' motion and that summary judgment is warranted on Plaintiffs' procedural due process claims.


**3. Retaliation under § 1983 (Count Three)**

Next, Defendants argue that summary judgment is warranted on Plaintiffs' claim for Retaliation under § 1983.  To prevail on a Retaliation claim, a plaintiff must demonstrate that: (1) he engaged in constitutionally-protected activity; (2) he suffered, at the hands of a state actor, adverse action "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights;" and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take adverse action.  See Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001); Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)).  The threshold requirement, then, is that Plaintiffs must "identify the protected activity that allegedly spurred the retaliation." Municipal Revenue

Services, Inc. v. McBlain, 347 Fed. Appx. 817, 823-24 (3d Cir. 2009) (quoting Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 282 (3d Cir. 2004)). However, even if a prima facie claim is made out, "the defendant may defeat the plaintiff's case 'by showing that it would have taken the same action even in the absence of the protected conduct.'" Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002) (quoting Green v. Philadelphia Hous. Auth., 105 F.3d 882, 885 (3d Cir. 1997)).

In the instant matter, Plaintiffs have not alleged nor established that they engaged in any constitutionally protected activity sufficient to implicate a claim for Retaliation under §1983. Indeed, Plaintiffs have nowhere "identif[ied] the protected activity that allegedly spurred the retaliation." McBlain, 347 Fed. Appx. At 823-824. Further, it does not appear that Plaintiffs have opposed Defendants' motion for summary judgment on their Retaliation claim. Moreover, based on the record before me, I do not find that Plaintiffs have engaged in any constitutionally protected activity sufficient to implicate a §1983 Retaliation claim. Thus, Plaintiffs have failed to meet their burden to defend the instant motion and the Court will grant summary judgment to Defendants on Plaintiffs' Retaliation claim.

**4. Taking**

Next, Defendants argue that this Court should grant summary judgment on Count Four of the Complaint which sets forth a cause of action for Inverse Condemnation under both the United States and New Jersey Constitutions. Compl. ¶ 118. Specifically, Defendants argue that Count Four must be dismissed since no taking occurred and the Grenville retained substantial economic value and beneficial use. The Court agrees.

Under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, paragraph 20 of the New Jersey Constitution, property owners must be paid just compensation for governmental takings.  Bernardsville Quarry Inc. v. Borough of Bernardsville, 129 N.J. 221, 231 (1992).  The New Jersey Supreme Court has held that protection from governmental takings under the New Jersey Constitution is coextensive with protection under the Federal Constitution.  Pheasant Bridge Corp. v. Twp. of Warren, 169 N.J. 282, 296,(2001), cert. denied, 535 U.S. 1077 (2002).  Typically, in a takings case, the determination whether a taking has occurred is clear because the government physically appropriates the property from the current owner.  However, the question of whether a taking has occurred becomes more complicated when it involves government regulation of a property.  Indeed, as the United States Supreme Court has recognized,  "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."  Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922).

For example, the Supreme Court has determined that a governmental regulation has gone "too far" where it "denies all economically beneficial or productive use of [the] land."  Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992).  In Lucas, the court stated that the government must pay just compensation unless "background principles of the State's law of property and nuisance" would restrict the owner's intended use of the property.  Id. at 1029.

However, if the regulation does not deny all economically beneficial use under Lucas, then the determination whether the regulation otherwise constitutes a compensable taking is governed by the standards set forth in Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978); see Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538-40 (2005) ("The Penn Central factors ... have served as the principal guidelines for resolving regulatory takings claims that do

39

not fall within the physical takings or Lucas rules."). In <u>Penn Central</u>, the court explained that there are "several factors" for evaluating regulatory takings claims, the most important of which are the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations [and] the character of the governmental action." 438 U.S. at 124.

In the instant matter, the entirety of Plaintiffs' taking claim amounts to the contention that "the Borough and its members . . . deprived The Grenville of valuable income by ruining its stellar reputation as a hotel and restaurant. . .as well as preventing it from operating over Fourth of July weekend in 2008." Pls' Opp. Br. at 23. In that regard, the Court notes that Plaintiffs have nowhere identified a <u>government regulation</u> that allegedly interfered with its ability to do business. Moreover, to the extent that Plaintiffs attempt to suggest that their inability to operate on July 4, 2008 amounted to a taking, the Court disagrees. Indeed, not only are the events of July 4, 2008 entirely unconnected to a government regulation, but it is undisputed that the Borough experienced a water problem on July 4, 2008 that required the water company to release water onto Route 35, the main road for the Borough. DSMF ¶ 63; PRSMF ¶ 63. Because of the holiday weekend, and, especially, the Borough's concern that the large amounts of water would cause traffic problems due to the holiday weekend, the police department notified the water company that it would have to return the following day to fix the problem. <u>Id</u>. ¶ 64; <u>Id</u>. ¶ 64. Moreover, it is undisputed that the water issue affected the Grenville as well as numerous other residents and businesses in the borough. <u>Id</u>. ¶ 65; <u>Id</u>. ¶ 65. In light of these undisputed facts and Plaintiffs' utter failure to point to a regulation that denied all economically beneficial use of their property, the Court will grant summary judgment to Defendants on Count Four.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment on all counts is

**GRANTED**.


Dated: December 19, 2011                              /s/ Freda L. Wolfson
                                                     Freda L. Wolfson, U.S.D.J.